## HOADLEY *et al. v.* THE LIZZIE AND CARGO.

*(Circuit Court, E. D. Louisiana.* May 21, 1889.)

**1. SHIPPING—CARRIAGE OF GOODS—DELAY.**

On October 2d libelants chartered a vessel to carry a cargo of lumber; the vessel to be at the port of loading by October 15th, "excepting the acts of God in weather * * * preventing," and to be loaded as fast as the vessel could receive. Though ready to be moved in two or three days, the vessel was allowed to remain moored at her wharf until October 11th, and did not reach the port of loading until November 2d. She was detained for painting four or five days longer, though it appeared that the painting could have been completed in three days. Fourteen days were consumed in loading, during which time the master was absent, and the loading suspended, for four days. The loading could have been done in six days, and the lumber was ready on October 15th. An old pilot advised the master to clear a certain bar when partly loaded, and have the balance lightered down, offering him lighters, but the master refused. When the vessel arrived at the bar, it could have passed over, but the master was absent, and remained away for six days, during which time he was urged to depart promptly with the cargo. The vessel did not get across the bar until December 22d, having gone aground. Libelants had meanwhile urged lightering, saying that the cargo would be thrown on their hands unless promptly forwarded, and that they would seize the schooner for damages, and had offered the master a tug to haul the vessel over the bar, which he declined. The sale of the cargo was lost by the delay. *Held,* that the delay in loading and departure violated the charter-party, and entitled libelants to damages.

**2. SAME—FREIGHT.**

Though the charter-party provided that the freight should be paid in advance on the vessel's being loaded, libelants could properly refuse to pay the freight because of the delay.

In Admiralty. Libel for damages. On appeal from district court.

Following is the opinion of the district court, delivered March 20, 1889, by BILLINGS, J.:

"The facts in this case, established by the testimony, are as follows: On October 2, 1888, the master and owner of the schooner Lizzie entered into a charter-party with Hoadley & Co., the libelants, to carry a cargo of lumber of about 90,000 feet, from Jay & Davis' saw-mill, on the Tchefuncta river, near Lake Pontchartrain, to Carthagena, United States of Columbia, South America, the vessel to be at the port of loading by October 15, 1888, 'excepting the acts of God in weather, such as storms, calms, head winds, preventing.' About the time of the making of the charter-party the schooner was at Morgan City, La., she having her center-board out of order and having it replaced. The charter-party also stipulated that 'there should be the usual quick dispatch in loading, as fast as the vessel could receive.' The master went to Morgan City. The center-board was replaced in two or three days, but the master allowed the vessel to remain inactive, and to stay moored at the wharf there, until October 11th, when he started for Jay & Davis' mill. It took him six days to come from Morgan City to the Rigolletes, where, by the quarantine, he was detained six days longer, for not having procured a clean bill of health, and he did not arrive at Jay & Davis' mill until November 2d, which will be observed was seventeen days after the time fixed for the commencement of the loading by the terms of the charter-party. Instead of proceeding at once to load, the master left the schooner in charge of a single man, and came to New Orleans and directed the schooner to be put on the ways at Madisonville for painting, where she was detained another four or five days. The evidence

shows that this painting could have been completed in three days. The lumber was ready, and had been ready for a long time prior to October 15th When the master commenced loading he consumed fourteen days in loading the vessel, and the evidence shows that loading could have been accomplished in six days at the outside. During four of these days he again left the schooner, and all work of loading was suspended. Up to this time there was an abundance of water on the bar, even after the master's return. The schooner at that time had nearly her hold load in, and Mr. Jay, one of the owners of the mill, an old pilot, advised him to at once proceed with the cargo in the hold as far as St. Joseph's island, and to have the balance of the cargo lightered down to him at that point; offered him the lighters, and told him he would not have such an opportunity for any great length of time. The master's reply was that he knew his own business. The water on the bar fell. The master went on slowly loading until the 16th November, and loaded the schooner to a greater depth than the water on the bar allowed, and finally started down the river. After he came to the ship-yard, where his schooner had been painted, he again left the vessel anchored in the stream, with only one man, and again came back to the city, where he remained for another period of six days. The testimony of the mate shows that the vessel, after it arrived at the bar, could have passed over; but the master was absent, and there was nobody there to take the vessel over the bar. When the master returned from New Orleans he told the mate that he was going to have trouble with the charterers, and asked him to fix up the log-book so as to fit the master's side of the case, and the log was then commenced. On November 16th the schooner started for the bar, and stuck fast and remained aground until the 16th of December. The master absented himself from November 23d to December 1st, and from December 3d to December 13th, with no one on board but the mate, and a portion of the time a cook, who was not a sailor, but who was sick, and in bed. The schooner finally got over the bar on the 22d of December, when the master came to the city, leaving his vessel at the ship-yard. He was told there was urgent necessity for the prompt departure of the cargo to South America. After it was learned that the vessel was aground, the libelants sent a messenger over, urging him lightering, with the statement that the cargo would be thrown on the hands of Hoadley & Co. unless it was promptly forwarded. These representations were made to the mate in charge, who, in the absence of the master, answered that if the proper precaution and energy had been used the vessel at that date—the 22d December —would have already delivered her cargo at the place of destination, and have been on her way back to the United States. The captain was found in New Orleans, and informed that unless the cargo started at once the same would be thrown upon the hands of the charterers, and they would seize the schooner for any damages they might sustain. At the same time they offered him a tug to haul the vessel over the bar. This the master declined. Had there been help on board the schooner to handle her anchors she would have been hauled over the bar, and could have been lightered on the bar, as she was subsequently lightered on this side of the lake, before going into the new basin. The mere taking off of her deck-load would have raised her up seven inches, and she could have gone over the bar at four or five different times. On December 22, 1888, Hoadley & Co. libeled the vessel and cargo, claiming damages $4,189 for breach of charter-party, and on January 14, 1889, the libelants discontinued the proceedings against the cargo, but reserved all rights against the vessel. Furthermore, the evidence shows that in consequence of the delay on the part of the schooner in loading and starting on her voyage the parties at Carthagena, South America, to whom the cargo had been sold, receded from their bargain, as they had the right to do.

The respondents have filed a cross-bill, asking $654 damages. The charter-

party provided that the freight should be paid upon the vessel being loaded, in advance. The libelants declined to pay the freight in advance, giving as a reason the delay which the schooner had made, and their loss of all opportunity to sell the lumber at Carthagena. The question now submitted is whether the libelants have a claim for damages, or whether the schooner is entitled to damages and freight. This being the case, so far as it is now submitted to the single question whether the master used requisite care and diligence in fulfilling the conditions of the charter-party, did he proceed in its execution with the promptness and vigilance which were requisite? The rule of law which must control this case is that the master was bound to proceed on his voyage with the first wind, and he must also proceed in loading the vessel with the requisite promptness. Upon the facts as they appear in the testimony for libelants, (for the respondents have put in no testimony, except three letters,) the court is of opinion that there was a failure on the part of the master, both in loading and in his departure, which was in law a violation of his contract; that the libelants are entitled to damages; and that the cross-bill must be dismissed. The matter is referred to K. Loew, commissioner, to take evidence, and report the same to the court, as to the damages sustained by the libelants."

*R. De Gray,* for libelants.
*Homor & Lee,* for claimant.


PARDEE, J. A careful examination of the pleadings and evidence in this case shows that the findings and decree of the district judge are correct. The delays on the part of the claimant in the execution of his contract seem to have been wanton and wholly inexcusable, and, wholly unexplained as they are, fully justified the libelants in breaking up the voyage, and in suing to recover their property and resulting damages. The claimant is entitled to no freight, because none was really earned, and because, if earned and required from libelants, then it would merely enhance their damages, all to be recovered in this case. It is therefore ordered, adjudged, and decreed that the libelants, Russell Hoadley, Chester C. Munroe, and Frank Wesson, composing the firm of Hoadley & Co., do have and recover *in solido* from William Gandy, master and owner of the schooner Lizzie, claimant in this case, and William Cunningham and Albert Gerdes, as sureties on the release bond, the sum of $330.91 damages, and all costs of the district and circuit courts, and that execution may issue on this decree within five days after the same is entered and signed.